688 P.2d 1191

**DEER CREEK, INC., an Idaho
corporation,
Plaintiff-Counterdefendant-Appellant,**

v.

**CLARENDON HOT SPRINGS RANCH,
INC., an Idaho corporation, Defend-ant-Counterclaimant-Respondent,**

and

**Lloyd Walker, Defendant-Respondent.**

**No. 14089.**

Court of Appeals of Idaho.

July 11, 1984.

As Modified on Denial of Rehearing
Sept. 27, 1984.

Bruce J. Collier of Kneeland, Laggis, Korb, Collier & Benjamin, Ketchum, for plaintiff-counterdefendant-appellant.

Stephen W. Boller, Hailey, for defendant-counterclaimant-respondent, Clarendon Hot Springs Ranch, Inc.

Lloyd J. Walker, pro se.

SWANSTROM, Judge.

This appeal arises from a suit brought by Deer Creek, Inc. (DCI) against Clarendon Hot Springs Ranch, Inc. (Clarendon) and Lloyd Walker. DCI asked the district court to (1) declare a deed from DCI to Clarendon void or, in the alternative, require Clarendon to convey certain real property to DCI; and (2) reform a second deed to Clarendon excluding a one-acre parcel with its appurtenant water rights. DCI also requested (3) damages for injuries allegedly caused by Clarendon's interference with a right-of-way; and (4) an injunction to prevent Clarendon from interfering with that right-of-way in the future. Clarendon counterclaimed for damages caused by DCI's allegedly willful, malicious and deliberate conduct in demanding a greater payment than actually due under their agreement. The district court denied relief on both the claim and counterclaim.[1] DCI appeals. We vacate the judgment and remand the cause for further proceedings.

DCI presents four issues on appeal. Did the district court err in (1) concluding that Clarendon could not be required to convey certain real property to DCI; (2) refusing to join Patrick Ryan, the majority stockholder in Clarendon, as an indispensable party; (3) ruling that Clarendon was not the alter ego of Ryan; and (4) concluding that Walker's conduct had no prejudicial effect on DCI?

The case was submitted to the district court upon a written record which included exhibits, affidavits and depositions. This record revealed, not always clearly, a complex series of business transactions revolving around efforts by Ryan to purchase some real property for himself or for his corporation, Clarendon. We commend the district judge for the ability and energy he exhibited in deciphering the sometimes murky dealings of the parties.

The pertinent facts are as follows. Sometime before June 1969, Patrick Ryan communicated to his friend, William Burt, president of DCI, his desire to purchase 200 acres of land (hereinafter designated as parcels I, II and III) then owned by R.B. Randell. Burt volunteered to negotiate a purchase for Ryan using DCI as the purported buyer. Accordingly, on June 20, 1969, Randell deeded parcels I, II and III to DCI and took a mortgage back from DCI to secure payment of the purchase price. DCI in turn deeded the property to Ryan's attorney, Lloyd Walker, as trustee.[2] Ryan was to supply all the money for this purchase and had some control over the trustee. The district court found that under the parties' agreement the deed to Walker was to remain unrecorded until Ryan satisfied DCI's obligation to Randell for the purchase price or Walker received instructions from DCI and/or Ryan.

In December 1970 Ryan and DCI executed a second agreement (hereinafter referred to as "exchange agreement"). Under the exchange agreement, Ryan was to give DCI his beneficial interest in parcel I plus $50,000 in exchange for land designated as parcels IV and V, and the surface rights to eighty acres of mining claims. For purposes of the exchange, parcel I and parcel IV were valued nearly equally, while the cash represented payment for parcel V and the surface rights.

Ryan's corporation, Clarendon, was formed in April 1970 with Walker as president and Ryan as the majority stockholder. Before any of the events occurred which

---

1. The parties stipulated that the district court should "resolve all issues of fact and law on Counts One and Two of the plaintiff's amended complaint and the answer and counterclaim of the defendants." Count three, concerning Clarendon's interference with DCI's right-of-way, was reserved for resolution by the court at a later date. Following issuance of a memorandum opinion on counts one and two, Clarendon and Walker moved under I.R.C.P. 54(b) to certify the partial judgment as a final judgment from which an appeal may be taken. The motion was granted.

2. Due to a mistake in description, parcel II was actually not conveyed in the June 20, 1969 deed from DCI to Walker. Although the mistake was not corrected until six years later, we have ignored it and other discrepancies in property descriptions for purposes of simplifying discussion of the transactions.

would entitle Walker to record his deed, Walker conveyed parcels I, II and III to Clarendon and two days later, on December 31, 1971, recorded the warranty deed for these parcels running from DCI to himself. On January 5, 1972 the deed from Walker to Clarendon was recorded. DCI did not receive notice of any of these transactions until much later. At this point in time, therefore, Clarendon held legal title to parcels I, II and III, while DCI remained liable to Randell for the purchase price. Ryan thereafter failed to make regular payments causing DCI to default on its mortgage to Randell. Randell commenced an action against DCI and ultimately received a judgment in excess of $100,000.

Burt sent a letter from DCI in January 1975 suggesting to Ryan that the exchange agreement be cancelled, at least in part, because Ryan still owed $45,343 principal and accrued interest to DCI. Burt stated that DCI could not be fairly compensated by adhering to the original terms of the exchange agreement. The letter purported to cancel the exchange agreement and requested Walker, as escrow agent, to return the deed for parcels IV and V running from DCI to Ryan. The district court made no findings concerning whether the exchange agreement was cancelled as a result of DCI's letter or was otherwise rescinded or modified by DCI and Walker. The parties highly dispute the status of the exchange agreement as of September 1975, when Clarendon was able to obtain a sizeable development loan to be used in part to pay off the Randell judgment against DCI (a lien against parcels I, II and III) and to pay off DCI so Clarendon could acquire title to parcels IV and V.

In September 1975 Walker wrote DCI about the loan closing. Apparently not knowing that its June 1969 deed to Walker, as trustee, for parcels I, II and III had already been recorded and that Walker had then conveyed the same property to Clarendon, DCI gave another deed to Clarendon covering parcels II, III, IV and V. In exchange DCI wanted $86,000 and the original "unrecorded" deed to Walker, covering parcels I, II and III. The cash payment was greatly in excess of what was due DCI under the exchange agreement (if this agreement still existed), but Clarendon allegedly consented to disbursement of the $86,000 to DCI under protest so that Clarendon could receive the balance of the development loan proceeds.

It is apparent that Burt expected the net effect of this transaction would be to vest title to parcels II, III, IV and V in Clarendon and parcel I in DCI. The deed to Clarendon was delivered and recorded, but the return of the original deed running to Walker did not result in vesting title to parcel I in DCI. As previously noted, it had already been recorded and the property transferred to Clarendon. Although DCI received the requested cash payment from Ryan, Clarendon denied that it was required to convey parcel I to DCI. Currently therefore, title to all five parcels is vested in Clarendon.

In count one of its complaint, DCI requested the court to set aside the conveyance of parcels I, II and III from Walker, as trustee, to Clarendon. DCI claimed that since the obligation to Randell had not been satisfied by the date of the transfer the conveyance was in violation of the terms of the trust agreement. On September 17, 1975, however, Clarendon had belatedly satisfied the Randell judgment against DCI. The district court held that this action entitled Walker, albeit after the fact, to record the deed to him and convey the property to Clarendon. The court indicated that under these circumstances Walker might be liable for breach of trust, but that Clarendon, in this action, could not be compelled to turn over title to parcels I, II and III.

The district court also held that Clarendon had no duty to convey parcel I to DCI under the exchange agreement since that agreement was between DCI and Ryan. Clarendon had not signed the exchange agreement and was not bound by its terms. Furthermore, although Ryan *was* bound, he was not a named party and therefore no judgment could be entered against him.

DCI moved to amend the findings of the court and amend its pleadings to conform to the proof. First, DCI argued that "a transferee of property from a trustee takes no title from the trustee if the transferee knows that the transfer is contrary to the trust." This principle, it was claimed, supported DCI's request to set aside the conveyance to Clarendon. Second, DCI argued that Clarendon was required to convey parcel I to DCI on the basis of a unilateral contract created by a letter to an escrow company and the ensuing conduct of the parties. Third, Clarendon could also be required, DCI contended, to convey parcel I under the exchange agreement because Clarendon was nothing but the alter ego of Ryan, who was bound by the exchange agreement. In response to the district court's findings, DCI also moved to join Ryan as an indispensable party under I.R.C.P. 19(a)(1).

The district court granted the motion to join Ryan upon the condition that he either file his own pleadings or agree to be bound by Clarendon's pleadings and stipulations. Ryan did neither and judgment was entered denying DCI's motion to amend the findings and amend the pleadings, denying DCI relief on counts one and two of its complaint and denying relief on Clarendon's counterclaim. DCI then moved to amend the judgment under I.R.C.P. 59(e), basing its argument on substantially the same grounds as its earlier motions. This motion was also denied.

Clarendon moved to certify the judgment as a final judgment from which an appeal may be taken. I.R.C.P. 54(b). The court granted the motion. DCI thereafter appealed. Neither Clarendon nor Walker, however, filed a respondent's brief. Therefore, this case is before us solely upon the brief of the appellant and upon oral argument, limited to the issues raised by DCI.

A

The first issue we shall discuss is whether Clarendon should have been required to convey parcel I to DCI. As noted above, the district court held that Clarendon was not bound by the exchange agreement to convey parcel I because that agreement was signed only by DCI and Ryan as an individual. DCI makes a somewhat mixed argument: that the exchange agreement was cancelled, but to the extent it defined rights and duties between DCI and Ryan, it was also binding upon Clarendon as the alter ego of Ryan.

DCI, however, primarily contends that Clarendon was directly bound by still another contract. As mentioned earlier, on September 15, 1975, DCI had sent a letter to an escrow company, Title Fact, Inc., and a copy of that letter to Walker. The letter contained closing instructions to Title Fact regarding the exchange of the various parcels of land and the cash. This letter, it is alleged, constituted an offer for a unilateral contract which Clarendon could accept only by full performance in accordance with its terms. In a masterful piece of circular reasoning, DCI then suggests, in essence, that we *force* Clarendon to accept the offer by requiring Clarendon to fully perform. We need not pass on the logic of DCI's position because we hold that the letter to Title Fact did *not* constitute an offer for a unilateral contract.

◼ In his memorandum opinion, the district judge stated: "I perceive of no right of Deer Creek to judgment directing Clarendon to convey any property to Deer Creek. Clarendon has never promised to do so under any agreement I am aware of or required to do so by operation of any law that I know of." DCI moved to amend that finding based on its unilateral contract argument. The motion was denied. We are constrained to uphold the district judge's findings of fact unless they are clearly erroneous. I.R.C.P. 52(a). DCI, however, insists that when the evidence is entirely in the form of depositions, affidavits and other documentary evidence, as it is here, we have the authority to make our own findings of fact. *See D & M Development Company, Inc. v. Sherwood and Roberts, Inc.*, 93 Idaho 200, 457 P.2d 439 (1969). We disagree and have taken the position that, considering the letter and

spirit of I.R.C.P. 52(a), even where the evidence is entirely in written form, the standard of review of a district court's findings of fact is whether they are clearly erroneous. *Avondale on Hayden, Inc. v. Hall,* 104 Idaho 321, 658 P.2d 992 (Ct.App.1983). We may, of course, "draw our own impressions from the record, but we will not substitute our impressions for findings of fact by the trial judge unless we are convinced that those findings are clearly erroneous." *Id.* at 325, 658 P.2d at 996.

With this in mind, we examine the evidence. The letter from DCI to Title Fact included the following statements:

1. Mr. Walker, counsel for the prospective mortgager [Clarendon], advises us by letter dated September 12, 1975, that the closing on subject mortgage is scheduled for September 17, 1975.

2. Enclosed is an executed Corporation Warranty Deed covering approximately 320 acres running from Deer Creek, Inc. to Clarendon Hot Springs Ranch, Inc., the prospective mortgagor.

Three days earlier, however, DCI had received a letter from Walker. That letter stated in part:

In any event, we are ready to close[.] [T]he deeds after execution should be returned to me with of course the appropriate letter of instruction from you to Title Fact which will handle the closing. The deeds will be presented to them and they, of course, will receive your check and handle it subject to your instructions.

We note that the district court made no specific findings as to the effect of or the relationship between these two letters. The absence of such findings, however, may be disregarded if the record yields an obvious answer to the relevant question. *Pope v. Intermountain Gas Co.,* 103 Idaho 217, 646 P.2d 988 (1982).

■ The record yields the obvious answer that DCI's letter to Title Fact was not an offer for a unilateral contract. A unilateral contract

consists of a promise or group of promises made by one of the contracting parties only .... [T]here is only one promisor; and the legal result is that he is the only party who is under an enforceable duty. The other party to this contract is the one to whom the contract is made, and he is the only one in whom the contract creates an enforceable legal right.

A. CORBIN, CORBIN ON CONTRACTS § 21 at 52 (1963). An offer for a unilateral contract calls for acceptance only by rendition of the requested performance. J. CALAMARI and J. PERILLO, THE LAW OF CONTRACTS § 1–10 (1977).

■ Clearly the two letters in question cannot be read separately. In the present case, DCI was not the only one to make a promise. Walker's letter on behalf of Clarendon also contained promises. Both letters concerned the same property and, in fact, Walker's letter requested that DCI send a letter to Title Fact, which it did. DCI's letter, therefore, was not distinct and isolated from the parties' overall business relationship, but was a response to the letter from Walker. It was *not* an offer for a unilateral contract.

Their terms, however, do appear to be inconsistent with the exchange agreement. First, Burt's demand that DCI be paid $86,000 for parcels IV and V is not consistent with the amount he claimed was due (as of January 23, 1975). Secondly, in the exchange agreement Ryan was to receive the surface rights to eighty acres of mining property from DCI in addition to parcels IV and V. However, at the time of the loan closing in September 1975, it was apparent that neither Walker—who was representing Clarendon in the transaction—nor DCI contemplated that DCI would transfer the eighty acres to Clarendon when the loan closed. In his affidavits Ryan asserted DCI breached the exchange agreement by attempting to "blackmail" Clarendon into paying more for parcels IV and V than was due and by failing to transfer the surface rights to Clarendon. Burt stated, on the other hand, that at some point the parties had mutually agreed it would not be feasible for Ryan to acquire only the surface

rights because a third party already owned the mineral rights to the claims.

As mentioned earlier, DCI asserted the exchange agreement was cancelled. The district court made no findings in regard to these issues of fact, nor is there an obvious answer to the relevant questions. Such findings are necessary before an appellate court can review the district court's ultimate conclusions of law. Therefore, we deem it necessary to remand this cause to the district court for further specific findings, with directions to take additional evidence if necessary on any disputed issues of fact. Until this is done we cannot determine whether the district court was correct in ruling that there was no agreement requiring Clarendon to transfer parcel I to DCI.

B

The next issue we will discuss is whether the district court erred by refusing to join Ryan as an indispensable party. Here, DCI moved to join Ryan after the court issued its memorandum opinion. As we mention later, one of the reasons given by the district judge for refusing to compel Ryan's joinder was the untimeliness of the motion. The judge felt that Ryan would not be bound by the record established in the district court through stipulation of the parties and that all progress in the case would be undone.

■ In *First National Bank of Hailey v. Bews*, 3 Idaho 486, 31 P. 816 (1892), the Idaho Supreme Court considered a statute which read:

> The court may determine any controversy between parties before it, when it can be done without prejudice to the rights of others, or by saving their rights; but when a complete determination of the controversy cannot be had without the presence of other parties, the court must then order them to be brought in, and thereupon the party, directed by the court, must cause to be served a copy of the summons ....

Idaho Rev.Stat. § 4113 (1887). The court held that such "necessary" parties may be joined at any stage of the action, "before decision of the court or a verdict of the jury." *First National Bank of Hailey v. Bews*, 3 Idaho at 492, 31 P. at 818. The "decision" of a court is its findings of fact and conclusions of law, or a written opinion in the nature of such findings and conclusions such as the memorandum opinion here. *Stewart Mining Company v. Ontario Mining Company*, 23 Idaho 724, 132 P. 787 (1913), *aff'd*, 237 U.S. 350, 35 S.Ct. 610, 59 L.Ed. 989 (1915). On the surface, then, the motion appears to be untimely.

■ The federal rule is almost identical to the current Idaho rule. It has been interpreted to allow the issue of nonjoinder of an indispensable party to be raised even after the trial on the merits has been concluded. *See Provident Tradesmens Bank & Trust Company v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). In view of the close relationship between FED.R.CIV.P. 19 and I.R.C.P. 19(a) and 19(b), we believe the purposes of the rule are better served by the interpretation placed upon it by the federal courts, as opposed to the interpretation placed upon a *similar* rule by the Idaho Supreme Court in the distant past.

When the issue is raised following trial, "considerations of judicial economy and fairness dictate that the court closely examine the merits of any assertion of nonjoinder to be certain that it really will have prejudicial effects." C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1609 at 88 (1972) (hereinafter referred to as Wright & Miller). Thus, of the three purposes behind rule 19—to protect the absentee from prejudice resulting from the judgment, to protect the parties from harassment by successive suits and to advance judicial economy by avoiding multiple litigation—only the first, prejudice to the absentee, would require reversal of the district court's denial of joinder or the modification of its judgment. An appellate court need not protect one already a party from successive suits, the possibility of inconsistent relief or the possibility of sole responsibility for a liabili-

ty he shares with another if he has failed to assert his right to compulsory joinder prior to the end of the trial. *Provident Tradesmens Bank & Trust Co. v. Patterson, supra.*

▇ In the present case, the district court entered judgment against DCI. Since Clarendon was thus not required to transfer parcel I, Ryan—the absentee— was not prejudiced by the judgment. Therefore, the court did not err by denying DCI's motion to join Ryan. *Id.* at 92. However, since we are remanding this case for additional findings, with instructions to take additional evidence if necessary, the joinder issue may again be raised. As we have implied, the district judge will be guided by different considerations where the motion to join occurs before the conclusion of the trial. In this case, the "district court should feel free to direct the addition of a Rule 19(a) absentee even [though the pleadings have been closed] when his presence in the action would further the purposes of the joinder rule and the original parties will not be prejudiced thereby." Wright & Miller, § 1609 at 88. This analysis will involve three separate questions: (1) is Ryan a rule 19(a)(1) absentee? (2) will the purposes of the rule be furthered by his joinder? and (3) will the original parties be prejudiced by his joinder? The district court should liberally grant joinder because the absence of an indispensable party is considered a significant defect. If the policies of the rule would be furthered by the joinder of a rule 19(a)(1) absentee, the prejudice to the original parties must be significant to justify denial of the joinder. *Id.*

### C

The extent to which this requirement of bringing Ryan into the case will "undo" the proceedings accomplished in the district court prior to this appeal is affected by another issue. The issue is the alleged error of the district court in ruling that Clarendon is not the "alter ego" of Ryan. In his memorandum decision dated July 11, 1980 the district judge frequently alluded to Clarendon as the alter ego of Ryan.

DCI then moved to amend its pleadings and the findings of the court so the court could compel Clarendon, as the alter ego of Ryan, to convey parcel I back to DCI in accordance with Ryan's alleged promise to do so. DCI also argued that Clarendon's alter ego status was further grounds for joining Ryan as an indispensable party defendant. The district judge then issued a written "ruling" dated August 29, 1980 in which he stated the belief that the stipulated record would not support holding that Clarendon was the alter ego of Ryan. DCI argues that this ruling was in error.

The Idaho Supreme Court has held that there are two requirements for application of the alter ego doctrine. They are "(1) that there be such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2), that if the acts are treated as those of the corporation an inequitable result will follow ...." (Citations omitted.) *Chick v. Tomlinson,* 96 Idaho 483, 485, 531 P.2d 573, 575 (1975).

▇ As to the first requirement, we believe there is ample, undisputed evidence demonstrating unity of interest and ownership. For example, Ryan's own affidavit dated August 22, 1979 repeatedly refers to transactions entered into between himself and DCI as if Clarendon and he were one and the same personality. Also, the counterclaim of Clarendon and Walker, asserting *Clarendon's* right to recover from DCI on certain agreements, makes repeated references to agreements actually entered into by DCI and Ryan. It is in respect to these same agreements that DCI contends Clarendon was but the alter ego of Ryan. Ryan's deposition is part of the record here. In it, Ryan was asked about his ownership of Clarendon stock and when he became a director or officer. He stated, "I always had power of attorney on everyone and was the major shareholder and the managing director at all times of this project. So let's get it on the record, I was the boss." Throughout his deposition Ryan consistently takes the position that he owns the real estate standing in Claren-

don's name. We are of the opinion that there is sufficient, undisputed evidence in the record showing a complete unity of interest and ownership between Ryan and Clarendon, eradicating their separate personalities so far as the transactions here are concerned. As to the second requirement, we further hold that to treat Ryan's promises and agreements in respect to the purchases here involved as if they were not binding on Clarendon would result in the injustice of forcing the district court to provide only partial, ineffectual relief and would greatly extend the litigation necessary to resolve the important issues in this dispute, exalting form over substance.

### D

■ The final issue raised on appeal is whether the district court erred in concluding Walker's conduct as trustee had no prejudicial effect on DCI. DCI argues that if a trustee transfers trust property in violation of the terms of the trust instrument, a transferee with knowledge of violation does not take title to the property. Rather, the transferee becomes the constructive trustee of the property and has the same duties the original trustee had. *See* A. SCOTT, THE LAW OF TRUSTS § 288 at 2367 (1967). DCI contends that Walker transferred parcels I, II and III to Clarendon in violation of the trust agreement which required Walker to hold the deed to the three parcels *unrecorded* until one of several events occurred. Clarendon had knowledge of this violation through its president, Walker. Therefore, according to DCI, Clarendon holds parcel I in trust for DCI's benefit.[3] While we accept the foregoing as an accurate statement of the law, for reasons we will explain, we hold that DCI cannot prevail on this issue.

The original transaction under which DCI transferred parcels I, II and III to Walker actually consisted of three agreements: a purchase agreement, an assignment and a declaration of trust. All were

---

3. DCI does not seek return of parcels II and III although they were also initially conveyed with parcel I. DCI has never contended that it was

executed on June 20, 1969. The purchase agreement provided in part:

### III.

The said Deer Creek, Inc., and the said Lloyd J. Walker, Trustee, shall be subject to the exclusive control and direction of the said Patrick D. Ryan. Both parties shall immediately accomplish, or as soon thereafter as can reasonably be done, any direction issued by the said Patrick D. Ryan.

. . . .

### IX.

The said Deer Creek, Inc., shall immediately execute and deliver a warranty deed to said property to Lloyd J. Walker, Trustee, the same to remain unrecorded until all obligations to R.B. Randell are met or until further direction by the parties hereto.

The assignment, on the other hand, provided:

### V.

[Walker] shall act solely on the written direction of [DCI] and shall be absolutely protected and held not liable for any claim whatsoever if he acts upon the written directions of [DCI]. [Walker] shall not be required to inquire into the propriety of any such direction.

. . . .

### VII.

[Walker] shall assign all his title, rights and interests in said contract of sale dated the 20th day of June, 1969, to the "actual purchasers" upon the written direction of [DCI].

Finally, the declaration of trust stated:

WHEREAS, I [Walker] had no right, title or interest in or to said piece or parcel of land, but the same was conveyed to me to hold in trust for the

---

to acquire ownership of parcels II and III under any of the parties' agreements.

benefit of whomever Deer Creek, Inc., shall in writing nominate or appoint, and his executors, administrators and assigns;

[A]nd I, Lloyd J. Walker, do for myself and my heirs covenant with Deer Creek, Inc. and its successors by these presents that I will at any time hereafter, upon proper written request of Deer Creek, Inc., or its successors, and at its cost and expense, by good assurance with conveyance at law, convey and assure [sic] said contract and all my right, title and interest as such Trustee therein to whomever Deer Creek, Inc., shall nominate or appoint.

▉ Where several instruments are executed at the same time as parts of one transaction, they are to be construed together as the whole contract between the parties. *Charpentier v. Welch*, 74 Idaho 242, 259 P.2d 814 (1953). In applying this rule to these three documents, we hold as a matter of law that they are ambiguous in defining the event which triggers Walker's right to record the corporate warranty deed from DCI to Walker for parcels I, II and III. "[W]here the terms of a contract are ambiguous, the interpretation and meaning of those terms are questions of fact and extrinsic evidence may be considered in attempting to arrive at the true intent of the parties." *Bennett v. Bliss*, 103 Idaho 358, 360, 647 P.2d 814, 816 (Ct. App.1982).

▉ The district court resolved the apparent ambiguity by finding that the parties intended the instruments to have the following meaning:

Walker promised to hold the Deer Creek corporate warranty deed until Ryan had satisfied the Deer Creek promissory note in favor of Randell and thereupon reconvey Parcels I, II and III to Ryan or ... Clarendon. In the alternative, Walker promised to hold the Deer Creek corporate warranty deed until he received contrary written instructions from Deer Creek or, in the second alternative, until he received contrary instructions from Ryan.

The finding that Walker could take his directions from Ryan alone is supported by substantial—although not undisputed—evidence in the record. Therefore, the finding is not clearly erroneous and we will not disturb it on appeal. I.R.C.P. 52(a).

The deed from DCI to Walker was recorded on December 31, 1971; the deed from Walker to Clarendon was recorded on January 5, 1972. The obligations to Randell were not satisfied until September 17, 1975. It is also clear that DCI never gave instructions to Walker to record his deed. Therefore, DCI contends that the recordation of that deed violated the trust agreement. Under the district court's interpretation of that agreement, however, there was still another way in which Walker could have recorded the deed and not violated his duties. If *Ryan* had authorized recordation, Walker could have acted with impunity. The district court did not find whether Ryan had authorized recordation but once again the record yields a clear answer. *Pope v. Intermountain Gas Company*, 103 Idaho 217, 646 P.2d 988 (1982).

In his deposition, Ryan said:

Q With respect to the deed that he received, what is your understanding of his instructions or his capacity? What was he to do with the deed?

A He was to make sure that that deal was filed properly in the name of my corporation, Clarendon Hot Springs Ranch, Inc.

Q Now, when you say "filed," was it your understanding that he was to file the deed?

A Yes, he was to make sure that my corporation had the assets that it paid for.

Q But when you said "filed," what do you mean by that? Was he to record the deed?

A He was to record it.

. . . .

Q But at some point in time, something should cause the deed to be recorded. Mr. Walker was holding it as trustee.

A  Well, me.  I said to make sure that it's recorded and make sure that I have the assets without any cloud at all as to who owns them, the corporation that I control.

Q  So what you're saying then is that to record the deed, all that would be required to have the deed recorded, that no other event would have to occur other than simply your telling Mr. Walker to record the deed?

A  No.  It's just academic.  You own something and you want it in your name.

Q  Did you tell him to record that deed at some point in time?

A  I already said I did.

This testimony was not contradicted.  We therefore hold that Ryan instructed Walker to record the deed and that such was not a violation of the trust agreement.  Clarendon received and still holds legal title to parcel I.  Whether Clarendon can retain parcel I will depend upon the findings and conclusions reached by the district court concerning the exchange agreement.

We make this final observation.  We are remanding this case for additional findings and conclusions.  Our rulings here should enable the district judge to achieve more complete relief on the issues that have been raised.  We expect that the district judge, whether he is the same one or a different judge on remand, may find it necessary to take additional evidence.  In any event we encourage the district judge to allow amendment or correction of pleadings where he deems it necessary to provide full relief or to conform to the evidence.  We know now, for example, that the counterclaim contained an obvious pleading error in referring to one set of agreements when the parties all concede it should have referred to the exchange agreement.  The district judge recognized a possible error but chose not to undertake an amendment himself, which he might have done under I.R.C.P. 15(b).  As a result many of the disputed issues of fact in regard to the exchange agreement were not decided.  By vacating the judgment we intend to give the district judge the oppor-

tunity to reconsider the issues in light of our opinion.  Particularly, the judge can determine whether Clarendon is obligated under the exchange agreement to convey parcel I to DCI.  At the same time the judge can determine whether Clarendon was forced to pay more for parcels IV and V than was due to DCI.

Costs to appellant.  No attorney fees on appeal.

WALTERS, C.J., concurs.

BURNETT, J., sat but subsequently deemed himself disqualified and did not participate in the final decision.

### ADDENDUM

### ON DENIAL OF PETITION FOR REHEARING

On petition for a rehearing DCI contends this court erroneously applied *Charpentier v. Welch, supra,* in holding that the district court could construe the purchase agreement, assignment and the declaration of trust together.  DCI asserts that although the instruments were executed at the same time, they were for different purposes.  DCI argues that where a declaration of trust "purports to contain a complete statement as to the existence and terms of a trust, the parties will not be able to vary or contradict the instrument by the introduction of oral evidence."  (*Citing* BOGART, THE LAW OF TRUSTS AND TRUSTEES § 51 (2d ed. rev. 1984).)

Here the declaration of trust did not purport to be a complete expression of a trust agreement, it cannot be viewed in isolation.  The declaration of trust was signed only by Walker.  It was but a part of the overall agreement involving acquisition of parcels I, II and III from Randell for Ryan.  Burt, DCI and Walker all acknowledged—in the purchase agreement—that Ryan was the "real party in interest."  DCI was merely the purported purchaser.  Walker was named a "trustee" to "retain" Ryan's interest in the property "at present."  Hence, there was the assign-

ment from DCI to Walker of the purchaser's interest in the Randell contract of sale.

■■■■ Moreover, the declaration of trust cannot control over the purchase agreement, so far as who shall have the right to direct the trustee, Walker. The purchase agreement, giving Ryan "the exclusive control and direction" of both DCI and Walker, was signed by DCI, Burt, Walker and Ryan. The declaration of trust was signed *only* by Walker. Even the assignment of the Randell contract was signed only by DCI, Burt and Walker. Neither DCI nor Walker could bind each other to a provision in the declaration of trust that conflicted with a provision in the purchase agreement. They *both* signed that agreement and were bound by its provisions. They could not change that particular provision without Ryan's consent. In summary, it was proper to construe the three documents together. The purchase agreement is probably controlling and at least it renders the declaration of trust ambiguous. Therefore, we re-affirm the ruling of the district judge that DCI was not damaged by Walker's disregard of the trust provisions.

DCI's second ground for rehearing is that we erred in directing a remand which allows the district judge to "determine whether Clarendon was forced to pay more for parcels IV and V than was due to DCI." DCI's argument is that because the district court denied Clarendon any relief on its counterclaim and no appeal was taken by Clarendon, the issues posed by the counterclaim cannot be reopened on remand. We disagree.

The first issue we discuss in our opinion is "whether Clarendon should have been required to convey parcel I to DCI." The issue has been raised by DCI. We remand this issue to the trial court to reconsider. This will require the judge to make certain findings regarding the status of the "exchange agreement" and to set forth each party's rights and duties under that agreement. We also have said that Ryan could be bound by the exchange agreement— even though he was not a signatory to

it—because evidence showed Ryan and Clarendon were *alter egos*.

Inextricably part of the first issue raised by DCI is another issue: Whether Clarendon or Ryan was bound by the exchange agreement (to convey parcel I to DCI) when DCI allegedly wrongfully demanded $86,000 from Clarendon before DCI would fulfill its obligations under the exchange agreement. The district judge did not fully decide the issue. For example,

(1) he did not determine the validity or status of the exchange agreement as of September 1975;

(2) he did not set forth what Clarendon and DCI's rights and duties were under the exchange agreement as of September 1975; and

(3) he found that Clarendon had no duties under the exchange agreement, but he reached that conclusion because Clarendon was not a party to the exchange agreement.

■■ On remand the judge will have to take a complete new look at the relationships of the parties under the exchange agreement. DCI itself has raised the issue which requires this re-examination by the trial court. Having done this, DCI cannot now slam the door on any reconsideration of the facts which also might have a bearing on Clarendon's right to recover under its counterclaim. The law of the case does not foreclose Clarendon from all relief as urged by DCI. In *Dawson v. Mead*, 98 Idaho 1, 3, 557 P.2d 595, 598 (1976), where an appeal by certification was taken from an order granting partial summary judgment, leaving some claims between the parties unadjudicated, the Supreme Court said:

Since the summary judgment did not concern appellant's counterclaim, it did not adjudicate all the claims for relief presented in this action. It could therefore only be a final judgment upon an express determination by the court that there was no reason for delay and upon an express direction for the entry of judgment. Since there was no such determination in this case, the summary judgment was subject to revision at any

time before the entry of judgment adjudicating all the claims. I.R.C.P. 54(b) (1958); *Viani v. Aetna Ins. Co.*, 95 Idaho 22, 501 P.2d 706 (1972).

The present case is similar. Here, only some of the claims between the parties have been tried. The memorandum decision of the district court makes this clear. No final judgment has been entered. We believe the broad authority granted to the district court on remand is appropriate. We also believe the petition for rehearing is without merit. Accordingly, the petition is denied.

WALTERS, C.J., concurs.